Good afternoon, Your Honors, and may it please the Court. My name is Paul Avalar. I'm with the Institute for Justice. We represent the plaintiffs' appellants in this matter, Vizaline, L.L.C., and Brett Melton. My clients make and sell drawings and maps. They sell information about real property. What is in the record? I know this is a 12B6, so when I say in the record, I mean in the complaint. I've looked at the complaint, but I'm still not exactly sure, and maybe you can explain it from what's in the complaint, this being a 12B6. As I understand it, your client, through computer-assisted geospatial and other techniques, takes somehow property descriptions, meets and bounds, and places them on a map, and then you sell them to 30 banks to use for their backup for their security, collateral for their various loans. But what is that process? How is that done? Is that stated in the complaint? I'm not sure it is. The full description of what my clients do is not stated in the complaint. What the complaint says and the core of the complaint that sets out what my clients do and do not do is the Record on Appeal, pages 18 through 21, I believe. So what happens is banks have potentially an interest in property. That interest in property is set out with a legal description that exists already in the world. They give that legal description of property, the meets and bounds descriptions, to my clients, and my clients then use that information. They plug it into their computer. Computers are very good at drawing out meets and bounds. Humans, not so much because of the way they're written out, but computers can draw that. Well, is that – again, I didn't see that in the complaint. Your Honor, what the complaint says is they take this information and they put it through their system, and what their system comes out with on the other side is a drawing that can then be overlaid by computer onto a satellite image as you would find in, say, Google Maps or Zillow. I understand it, and you state this in your opening brief at 6 that when you're doing this process, you quote, it flags potential meets and bounds discrepancies illustrated by the drawing. Yes, Your Honor. So you point out these discrepancies. Now, again, just what's in the complaint? How does this system allow you to note these potential discrepancies? And, again, I just want to know what's in the complaint, not some other data you might have. The complaint says, Your Honor, that maybe the property description describes the wrong size of property. It says it's 40 acres, but the drawing itself only encompasses 10 acres. What does your complaint say about how this system knows that the meets and bounds are 40 acres but the drawing is only 10 acres? Your Honor, because the meets and bounds – Now, again, just what's in the complaint? Meets and bounds describes property by direction and distance, and that direction and distance describes a shape. And how is that not surveying under the definition in the Mississippi statute? Your Honor, it's not surveying because what my clients are not doing is establishing meets and bounds descriptions. Those meets and bounds descriptions are already established. That's what they get from the banks. That's the legal property description. But I hear what you're saying, but Mississippi – and they can correct me if I'm wrong. I don't think I am. Mississippi thinks what you're doing there is surveying. The board – yes, Your Honor. Isn't that right? They think – they say, Well, we define – you may define surveying this way. We define surveying this way. What you do is surveying.  Now, we disagree. And so given that – this is the key question for me. Why, then, isn't what Mississippi doing is regulating conduct and incidentally burdening your speech? Your Honor, because what my – there's nothing that my clients are doing that is conduct. They are taking preexisting – Well, what about all the description of the computer manipulations that is going on that you talk about? I'm looking at the complaint, and that's all there in the complaint. Why isn't that conduct that Mississippi is regulating and then the speech elements – and I'm going to ask them if they concede that everything you're talking about is speech. Why isn't it an incidental regulation of speech? Because I know – I've read NIFLA, and NIFLA says everything that you say it does, but it also says, Look, there are two narrow exceptions to the so-called professional speech doctrine. One of them is regulating conduct, incidentally regulating speech. That's what I want to know. So talking about the incidental regulation issue first, Your Honor, what NIFLA says is that a regulation of speech that is incidental to the regulation of conduct has to do with the speaker's conduct. What is it that the speaker is doing that is conduct? In NIFLA, of course, the speakers were speaking. They weren't engaged in the conduct. That's why the NIFLA court distinguished the Casey decision. In the Casey decision, doctors are performing abortions, and that is conduct, non-expressive conduct. And for that reason, the state has the ability to regulate the speech of the doctors incidental to the regulation of their conduct. But Sorrell – That's obvious because if I go to a doctor – forget abortion. If I go to a doctor and I'm going to have a knee replacement or something, the law can say, hey, doc, you've got to get informed consent from the guy first, right? And sure, you have to get some speech or you have to give them a warning about it. So that's incidental. Now, why doesn't that describe what you're doing, surveying with speech incidental? Because what my clients are doing is not conduct. Under Sorrell, the use of information, it's preexisting, it's out there in the world, to create, generate more information, including for the dissemination and sale of that information, is speech, not conduct. You could make the same argument for a man that's out there with a gauge making the measurement. Oh, no, this isn't conduct. I'm speaking. I'm telling you this is 30 feet from here to here and it runs due north. Yet he's done that with an instrument. You could extend your argument to any conduct and say, oh, this is just speech. Respectfully, Your Honor, I disagree. The question would be what is triggering the government regulation of what that person is doing or what my clients are doing? In this case, what has triggered the regulation— No, it's not what has triggered it. You're not making—you're making an as-applied challenge here. Yes, Your Honor. And I think you're getting a far field from that. This is a limited as-applied conduct—I'm sorry, challenge, where you're saying nothing we do is conduct. It's all speech. That is correct, Your Honor, because my clients are being regulated for making and selling information, and that's all they do. That's what they do. Now, the difference, Your Honor, that you're getting at earlier when someone's actually doing a survey, what's the purpose of a survey? The purpose of a survey is to establish property rights,  and that's what creates property rights. Describe something that a surveyor is doing that is clearly conduct that you don't do. You may be doing that already, but that's what I'm— They establish property rights, or they establish meets and bounds. That's the legal effect of what they do. Your Honor, the legal effect is the reason that a surveyor can be regulated. The state has the ability to regulate the legal effect. That's what I'm getting at. You say you're not doing any conduct, and I understand the argument. You're taking preexisting information, and you're manipulating it and selling it. Yes, Your Honor. That's speech. That is speech. So what is the surveyor, sort of the core example of the surveyor, what's his conduct that's different from what you do that the state can say, yeah, I'm regulating that? In any number of cases, Your Honor, they could be going out in the field, and they could be placing markers, and those markers establish where you take measurements from and what the boundary lines are. They go out, and they establish boundary lines, and those boundary lines establish property rights, and that's what they do. My clients— It's not in every case. I mean, if you buy your property and you decide to refinance, a surveyor comes out there and resurveys. They don't start from scratch. They take the legal description, which your client does, and they put it on the ground. It seems to me what your client does is take that same information only from a computer and place it on a map as opposed to standing out there on the ground, but the result is the same. It's creating an image on a piece of paper. As information to help people understand their property. Which is what the surveyor is doing. Not in all instances, Your Honor. Surveyors do lots of other things as well. When surveyors do— But they're regulated regardless of what they do. As a licensed surveyor, yes, they are. My clients, of course, are not licensed. They've not subjected themselves to those sorts of regulations already. Surveyors have that. The state of Mississippi can regulate the practice of surveying. That's not our position here. Our position is they can't sweep into the practice of surveying constitutionally my client's speech. Well, they might be able to. It depends. Well, I take that back, Your Honor. If we agree with you that they are, in this as-applied challenge, they're regulating speech, then Mississippi still might be able to regulate it. It's a question of what showing do they have to make to regulate it. You are correct, Your Honor. My apologies. I misspoke. There's sometimes an unfortunate tendency to say, well, the First Amendment applies, therefore it's protected. Holder is an example of a case in which, yes, the First Amendment applies to the speech, but no, that speech isn't protected. They might have to prove up their important governmental interest and that it's reasonably tailored to— because I can imagine all sorts of reasons why Mississippi might say, well, we've swept a little bit more broadly on surveying because what your client is doing or what people like your client are doing can create certain problems, and so we need to be able to regulate that as well as the guys walking around doing the markers. That is correct, Your Honor. I believe that's the point that this Court was getting at in Seraphim, which, of course, postdates Hines, predates NIFA, where they said where a licensing regulation sweeps in speech that is outside of the state's interest, that's a problem under the First Amendment. That's the basis of this Court's finding, the Texas Psychology Licensing Act to be unconstitutionally overbroad. Let me ask you about—so what I was thinking about is professions where just about everything the professional is doing is speech, like the psychologist. The whole practice is I'm talking to someone. What if the state regulates that, the content of that speech? Is that immune from First Amendment analysis in your view? Your Honor, I don't know that it is, and other circuits have struggled with this idea or this issue, admittedly. This issue comes up, I think, most frequently in the psychology area when you're talking about so-called gay reparative therapy, and the Ninth Circuit and the Third Circuit have both looked at this case. I think the Third Circuit has the right take on this, which is this is a regulation of speech, but it's a regulation of speech that is justified based on the factual showing that the government has made that there is a real problem here and that this law is the narrowly tailored way of doing that. Well, to take it out of that sort of explosive context, aren't there cases about states requiring doctors to give sort of advice about a gun ownership if one of their patients owns a gun? That's the Walschlager decision, Your Honor. Do you agree with the result in that case? We do, Your Honor. The Eleventh Circuit en banc in that case said this is a regulation of speech. It doesn't matter that it's occurring within the confines of medical license or medical practice. It's just speech. And for that reason, the government... Building on that, I thought you would say that, so building on that, what if a licensed surveyor who does the meets and bounds as well as what your client does goes to Mississippi and says, hey, look, guess what, you're regulating part of my conduct, but you're also regulating my speech, and so I'm going to challenge it based on the First Amendment, the regulation, and then all of a sudden aren't we in danger of blowing up Mississippi's regulation of surveyors? No, Your Honor. I think for two reasons. One, Serafine from this Court already recognizes that as applied challenges to occupational licensing laws is possible under the First Amendment. Again, it depends on the facts of every case. That's the nature of as applied challenges. The second reason is, as we stated in our brief, most state occupational licenses in most instances won't implicate the First Amendment to regulate conduct, not speech. Prescribing, performing surgeries, anything like that. It's only in these, I think, rarer cases where you have an occupational license regulating what is purely speech without a conduct hook, and that's this case. It seems your client puts the end result is a drawing on a piece of paper, correct? That is correct, Your Honor. But there's some conduct involved. I mean, maybe the computer generates the information and draws, comes up with the figure, but even if the computer's conduct, it involves conduct. It involves taking information and creating a written document on which banks rely. But the purpose of the regulation, or the regulation applies entirely because of the communicative aspect of what is put on the paper. The state is regulating the communication. And accurate meets and bounds descriptions being conveyed to people interested in property rights. And that's true whether you're a surveyor, simply taking the meets and bounds description from the deed and locating it on the ground. That's information finding it on the ground, whereas this computer takes it, does a spatial drawing, and puts it on paper. I don't see much difference. But the important thing is that the reason the state is regulating is because of the information being conveyed. This goes back to the Holder v. Humanitarian Law issue. The regulation statute applies to creating, preparing, or modifying electronic computerized data relative to such activities. What is it you're doing that's outside that? We don't do anything that's related to such activities. We don't establish property rights. We don't place boundaries. We don't do surveys to lay out land. That's not what we do. We take the preexisting information and we try and help banks understand that. What I thought you were going to say was that that does capture what you do, but you say that as applied to you, it violates the First Amendment. Your Honor, I see my time is almost up. Yeah, I mean that's Part D. Judge Barksdale was reading from Part D. Part D. And I thought – well, correct me if I'm wrong. I thought that that would have swept in what you do. But as applied to you, you say it violates the First Amendment, or at least it's subject to First Amendment scrutiny. What my clients do is they take the information, and, yes, they build out computer information on that. But it's not relative to the performance of A, B, and C, which is the second part of Subpart D. That is, my clients don't establish, reestablish, retrace. That's not what they're doing. They're not creating or recreating property rights. You're outside the record now, outside your complaint. Your Honor, our complaint says specifically that we don't do those things. Don't – when you – well, again, I don't want to get outside the record either. But I don't know how you can create, prepare, or modify electronic or computerized data that you sell to entities. I don't know how that can't be conduct when you're inputting the data into the computer. I think the state has – arguably has a legitimate interest and want to make sure that's accurate. Your Honor, may I respond? Of course. The state may have a legitimate interest, but that doesn't go to whether there's a First Amendment issue here. That goes to the state's justification for the restriction on the speech in the first instance. And we're back to then the Sorrell issue, which is the use, creation, and sale of information is speech, and regulations or restrictions on that are subject to the First Amendment. Sorrell is what? Pharmaceutical data? I'm probably getting that wrong, but it's data with respect to drugs. That is correct, Your Honor. It is data with – No doubt the state has a legitimate interest in regulating that, and yet the Supreme Court said, well, it's subject to First Amendment scrutiny nonetheless. That is correct, Your Honor. And the district court in this case, as I understand it, subjected this application to you to no First Amendment scrutiny. That is correct, Your Honor. The district court in this case said the First Amendment does not apply because this is an occupational licensing law in light of NIFLA, but also in light of this court's decision in Seraphine. That's not correct. Thank you, Your Honors. Mr. Bobo, what's the status of the enforcement proceeding? Judge, they've been held in abeyance to conclude this process. I'm sorry. Go ahead. I'm James Bobo. I'm here for the appellees from the Mississippi Attorney General's Office. But it is, just so I understand, it is the state of Mississippi's position, the board's position, that the definition of surveying as laid out in the statute does apply to what Visalign is doing. Yes, sir, and if you stay in the confines of the complaint, it's what the complaint states. The complaint states that the state of Mississippi has content-neutral regulations of the practice of surveying, including licensing requirements. The complaint says that the board determined that they were engaged in surveying under the Mississippi statute. Now, in their complaint, they allege we're not surveying, but that's a conclusion that the court's not required to give credence to. But they make a number of allegations in their complaint about what precisely their actions are with respect to the data. Yes, sir. I agree with you. Surveying, I mean, that's a legal conclusion that Mississippi can regulate. Mississippi can say anything it wants is surveying, right? But the question is, has it defined surveying so broadly that it applies to pure speech and is therefore subject to some kind of First Amendment analysis? I don't think that's this case. Why not? Because each of the cases they rely upon, the courts engage in some initial gatekeeping, and they always gatekeep out professional licensing and regulations. But surely you're not taking the position that if a state says we are engaging in the regulation of a profession through the licensing process, therefore the First Amendment is not implicated. That's not your position. No, sir. If you look at NIFLA, NIFLA says go look at Planned Parenthood. You look at Planned Parenthood, and it says certainly the First Amendment rights of the doctor not to speak were implicated, but solely in the context of the practice of medicine, subject to reasonable licensing and subject to regulations. Then why couldn't NIFLA have turned in this way and said, look, California has said, look, these crisis pregnancy centers are engaged in the practice of medicine, and we're just making them speak pursuant incidentally to regulation of the practice of medicine? Why wouldn't that apply perfectly to the NIFLA situation? Well, I think in that case California had not done that because, in his opinion, Justice Thomas goes through and he says, and counsel mentioned these triggers, where you find trigger in NIFLA is it says the service triggers the state action. And then he goes on to say, but California regulates the unlicensed practice of medicine. And then he cites that California statute that says you have to have a license to diagnose, treat, and prescribe. Well, all those processes are, depending on the case, are processes that could be purely speech. Diagnosing, treating, those things are- So if the compelled disclosure of where an abortion can be obtained and the phone number had been included in the medical regulation in NIFLA, do you think it would have come out differently? Not necessarily. I think you'd have to look at the context of whether the state had undertaken their action. If you go back to Planned Parenthood, that was a-the section on this is licensing involved compelled speech, the doctor's right not to speak, which is the same kind of issue that you had in NIFLA, which were, hey, if you get people in here, you've got to give them this information. And the court said, in that setting, you don't have to. I think where you go back to, and you probably put your finger on it, is the matter of informed consent would be what-one of the things that would be looked at. Well, you were talking about what triggers the state regulation. In this case, as applied to Vizalign, what is it that triggers the state's interest in regulating that they're doing? What they're doing is locating boundaries. They're doing it in a graphical, virtually, if you will. They're locating boundaries. Well, the state statute says locating boundaries, mapping within the context of the practice of surveying, is regulating conduct, and you have to have a license to do that. I think the Hines v. Aldridge case gives you a good framework to look at conduct. In that case, which under the rule of orderliness, I think, controls many issues in this case. Unless NIFLA is abrogated. I mean, it does rely on the professional speech doctrine, and it cites at least one case that is explicitly abrogated by NIFLA, doesn't it? Well, that's something that Aud Bonk will have to decide. No, no. Well, in that case, let me go to that, there's also other reasoning about the professional licensing. So you've got, yes, professional speech, that analysis is questioned, but you've still got other reasons that get you to the same place under the traditional concepts of professional regulation. Possibly. Maybe the outcome might be the same. I don't know. But I'm just talking about the reasoning of the decision. To the extent that it relies on a category of professional speech, I read NIFLA as saying there is no such category. And you'd be correct. I'm just saying when you parse out Hines, I think you will come to the conclusion that it hadn't been abrogated. I mean, that was veterinarian. If you're going to give somebody advice about their animal, you've got to examine the animal. Yes, sir. But let's look at the conduct that's in that opinion.  Having a license, not having a license, conduct. Then the veterinarian would gather information. He'd get information from other veterinarians that had actually seen the animal. So there was this gathering process, and then he would process information and issue a veterinarian opinion. Well, that parallels this case perfectly. You've got the conduct of not having a license. You've got the conduct of gathering information. You've got the conduct of processing the information. And then you've got the conduct of issuing an opinion within the practice of surveying. And so if we go back to the constrictors of the complaint and come down, I think you've got to say within that there was conduct, if conduct's required. What's laid out in the complaint, what are they doing that is non-expressive, non-speech, in your view? Well, the gathering of the information and processing the legal descriptions of property. That information's already there, right? They don't create it. They're gathering pre-existing information. They're running it through a computer. It produces lines on a map, and then they sell it. Do you agree that some of that is clearly speech? Well, they said you needed a computer. A computer's certainly helpful in drawing a polygon of a legal description. But it can be done with a hand and a ruler. And so that's a math problem. But when you start saying here's your boundary, here's where your property is in relation to this tree, this house, this river, then you're giving a surveying opinion. You know, I guess we use it still. There used to be an expression in the early computer days, garbage in, garbage out. And that's where I have a problem with the argument that all of this is speech because I say none of this is conduct. All of it is speech. Well, you've got to put data in the computer. And, again, this isn't found in the complaint. We're dealing with an as-applied and a 12B6, and I'm just not sure that we don't have conduct here. We have to have. And the state has an interest in making sure, just like it wants doctors to have graduated from medical school, it's got an interest in making sure that people that are allowing or conveying, surveying data, which is so important, and a safety issue in some instances, that at least they are competent to do that. And that's where I have the problem with this is all speech and no conduct. Yes, sir. It's a very important area of human life here. It affects the soundness of the banking system. It affects people's relationships with their neighbors. Although you can presumably, if you could prove that, you could adduce evidence that showed that, then the state could overcome whatever scrutiny under the First Amendment, right? The district court, of course, said there is none. Yes, sir, and I think that's what the case law is telling you the standard is. If you go to Planned Parenthood, Justice Thomas says, go look at Planned Parenthood. You look at it, and you say, how is the speech implicated? And if it's implicated solely as this practice. Okay, there at Planned Parenthood, you have a doctor providing abortions, right? Clearly conduct that the state has an interest in regulating, and then incidental to that, the state says, and you must reveal this information, right? That's Casey? Yes, sir. Okay. Here, we've got speech. We've got drawing lines on a map. Assume you agree with that speech. Where's the conduct part of it that is analogous to the Casey part? Well, I think you go back to not having a license. No, no, no, no. What are they doing? Well, they're gathering information, they're processing it, and then they're giving a surveying opinion. I mean, is that most of the statute that defines surveying, what is sort of the core instance of surveying that the state is interested in? It's not just gathering information, right? Well, the most important portion of this behavior, the conduct by them, is marking the boundary and marking it in relation to other properties and other fixed points on earth. The definition of surveying also includes mapping. Now, it doesn't include all mapping. A kindergartner can draw a map, but when it's conveying a surveying opinion, then it's a whole different thing, and the state can regulate that as part of its licensing and its other regulations as the threshold analysis of whether you have to get into whether the state has a compelling interest and all these other things. The case law just doesn't support that. Where is this conveying a surveying opinion? Where is that found, either in the statute or in the allegations in the complaint? Well, in the complaint, the factual allegation is that the board has determined that they're engaging in surveying. I'm talking about their complaint in this action, the complaint we're bound by. Yes, sir. It specifically says that the board determined that they're engaged in surveying. I may not be understanding this question. The record is pages 16 through 20 has multiple paragraphs. I mean, I'm counting, well, altogether there's 85 paragraphs, but, well, no, there's 77. But there's multiple paragraphs talking about what their business is. It's very, very specific about what they're doing. Yes, sir. I think that's what Judge Barstow is asking. I think it's the 17th paragraph that I'm working from memory here that talks about what the board did, the board's determinations. And I've written that down, and I'm scanning, and I do not see my note on that. I mean, for example, paragraph 44 says, Visalign takes those legal property descriptions and enters that information into its computer program to generate simple graphical renderings of the descriptions. Paragraph 45, Visalign then overlays the graphics onto satellite images. And then the next paragraph is where it says they flag potential meets and bounds discrepancies. Now, if I do that and I present it to someone and say, here, look at this, do you agree that that is speech? That communication is speech. It doesn't matter whether I've sold it or not. It doesn't matter whether you've sold it or not. But it's also conduct. Yes, it's transactional. Now, I think if you look at Sorel, the part of Sorel that is quoted in Hines v. Aldridge, it talks about, it says commerce or conduct. And on your point on the Sorel case, Sorel involved telling two classes of businesses that they could not engage in marketing with certain information that other people could get and swirl around the planet with no governmental restrictions. And so you had a content restriction. Can't anyone get the legal descriptions of property that have already been laid out? If that's a recorded deed, yes, sir. So anybody can get that? Yes. How is that any different than the information in Sorel? All right, well, the regulation is content neutral, whereas in Sorel you had a content-specific regulation. How is it content neutral? There's a specific kind of information that the state is interested in regulating. They're not interested in regulating descriptions of specific things, right? Land boundaries. Yes, sir. How is that content neutral? Because in the same way that any professional licensing would be content neutral, the Texas statutes and lines were declared to be content neutral. Now, the subject matter, you're talking about medicine, you're giving a medical opinion or you're giving a surveying opinion or a psychology opinion. Those things do indicate the content, but the courts have not come in with licensing and said, Aha, you can't separate the world into doctors and non-doctors. You can't separate the world into lawyers and non-lawyers, surveyors and non-surveyors. The law clearly allows state governments to make those separations. Part of that separation is what they can talk about, even in a pure speech setting such as psychology, family counseling. Those are things that you find regulated. The state regulated a doctor and said, You must ask your patients whether they have a firearm. Is that a content neutral regulation? That would have other problems, but it does cover the content of that conversation. Would that be subject to any First Amendment scrutiny in your view? I think you'd have to look as if it's being, if it's under Planned Parenthood, if it's implicated or incidental because of the practice, then you'd have to look at the practice. I think the expansion of the practice of medicine to include whether somebody's got a fire extinguisher or a fire alarm would not meet that context. But here you have a traditional surveying opinion, and the complaint basically sets that out, that the board has to determine that they're engaged in surveying. When you were asking questions, Judge Duncan, I thought of this. What they generate in the complaint they concede is not accurate. It's inaccurate. Where do they concede that in the complaint? Where do they concede that what the information they're generating is not accurate in the complaint?  You can complete your point. But where I was going is if you had a licensed professional who suddenly finds himself at the business end of professional liability or whatever, a board action with no harm, saying you've violated the statutory requirements of Mississippi that your mapping information be accurate, well, under their scenario, that licensed surveyor could say, well, I don't even need a license to do that. This is beyond the purview of the state to control my behavior. And the slippery slope, which I think the district court identified, more of the unworkability of what they're asking you to do is that you get into this parsing of conduct and speech and what I do all day spent. And moments ago you had a per se lawyer representing himself and that was problematic. But if all licensing goes away just because I'm not operating a backhoe and instead I'm hitting a keyboard, then you're going to have problems on a level that should be solved by the legislative branch. So you've got history says that the states can regulate this. Incidentally, it can regulate state. Thank you. Your Honors, if I may, four points. First of all, parsing conduct versus speech is precisely what the Supreme Court says courts have to do in NIFLA. And so for that reason, it is important that the courts parse professional conduct versus speech. And NIFLA says how to do that. Second of all, Your Honor, I believe Judge Owen, you had a question about, well, Visalign does other things, they type information in or they take the information. I would turn Your Honor's attention to the case that we submitted in the 2018. In paragraph 51 you state, as compared to traditional surveys, Visalign charges banks very little to take the preexisting meets and bounds information from deeds or other legal descriptions. So they take it. They check it. They obtain it. Yes. That's conduct. Input that data into their program. That's conduct. Generate simple geographical renderings of the data. That's conduct. And overlay the graphics onto satellite images. That's conduct. Respectfully, Your Honor, I disagree. Well, you may disagree, but they're engaging in conduct to do that. Your Honor, I believe Sorrell answers the question there. That's taking information to generate more information and selling that information. And Sorrell says that speech, subject to the First Amendment. Your Honor, I would point you to the Telescope Media Group case that we cited in our 28-J letter, where the state argued in that case that a company that was making wedding videos was engaged in conduct because it set up a camera and it set up a microphone and it entered into a contract to produce a video. And the court said there, no, no, no. Look, all of those things are elements going to the final product, which is speech. It's the video. The video is undoubtedly speech. And the little things that you do along the way is all part of that speech. The question here, as the court directed us to look at in the Holder case, is what's the thing that's triggering? Why is this the statute, which generally applies to conduct? Agreed. I'll throw that back at you. I mean, what Judge Barksdale just read is that you take the preexisting meets and bounds information from deeds. Based on your knowledge of the Mississippi Regulation, does that trigger the Mississippi Regulation? Are you surveying them to take the meets and bounds descriptions? I don't believe that we are, Your Honor. Okay. When you input that data into a program, does that trigger the surveying regulation? No, Your Honor, I don't believe it. When you generate simple graphical renderings of the data, does that do it? I don't think that does it either. So what is the trigger? It's the transferring that information to the banks. That is my understanding of what the board thinks my clients did wrong. Because if my clients did all of that stuff and then just sat on it, I don't think that's surveying even as the board thinks. We're not here talking about what you think. We're here talking about a profession, I'm sure you'll agree, is the classic that needs to be regulated, surveying. Now, you say it's not surveying. They say it is surveying. But this is certainly an area that the state can regulate. Don't you agree with that at least? Your Honor, we agree that the state can regulate surveying to the extent that it has an interest in that. The question in this case isn't whether there's a good reason for regulating. The question is, in this case, does the First Amendment apply to what my clients are doing? Even if it does, you're probably not going to like the outcome. I think what we're all hearing is, even if you apply a speech analysis, you probably lose. Your Honor, respectfully, I disagree, because I think the facts of this case, and, again, this is an as-applied challenge, the facts in this case are particularly compelling. Our clients take this information, they sell it to banks who are sophisticated users of information, who know what they're getting. They have a disclaimer that the board wanted them to apply, and they follow the board's current guidelines that they have promulgated and say, this is information that you can use for your purposes. It's not definitive. This is not a survey. It's not a substitute for a survey. I'm not saying that banks are sophisticated users and they know what they're doing. That's just pie in the sky. We're dealing with your complaint. And the complaint, Your Honor, says that banks are sophisticated users of this information in their banking practices. Banks are certainly sophisticated when it comes to banking practices. They might be sophisticated about making loans. I doubt that they're, and, again, we've got to stick with your complaint, but the comment you just made out of your complaint has vastly different meanings, and we can't take from that that means they know what they're getting and they know whether it's accurate or not. And what we want in this area is accuracy. And, Your Honor, I understand that. The question in this case is whether or not the First Amendment applies to my client's speech. At the 12b-6 standard or position, that's the only question that is relevant today. And if Your Honors think that the state— How whether you win or not, right? Ultimately not whether we win or not. I don't mean to break the saying even what level of scrutiny. I thought the question was does the First Amendment apply at all. That is correct, Your Honor. That is the sole question before this Court today, is does the First Amendment apply to my client's speech. The district court said no and for that reason didn't apply any First Amendment scrutiny. We haven't—the state hasn't had its chance to put forward the real evidence that the First Amendment says the state can win on. We can go back on remand, and then we should go back on remand to allow that to happen. The limited question today is does the First Amendment apply, and for the reasons given in NIFLA and Sorrell and in Holder and in this Court's decision therapy. Thank you, Your Honor. Thank you, Your Honor.